Filed 6/6/25  P. v. Contreras CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROGELIO CONTRERAS,<br>SANTOS GRIMALDI, and<br>MELVIN SANDOVAL,<br><br>    Defendants and<br>Appellants. | B321051, consolidated with<br>B322709<br><br>(Los Angeles County<br>Super. Ct. No. BA396138) |

APPEAL from judgments of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed as modified.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant, Rogelio Contreras.

Brad K. Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant, Santos Grimaldi.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant, Melvin Sandoval.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

* * * * * *

**INTRODUCTION**

On appeal from being convicted of the murder of a 13-year-old girl, Santos Grimaldi (Grimaldi), Melvin Sandoval (Sandoval), and Rogelio Contreras (Contreras) (collectively, defendants) raise a plethora of challenges to either their convictions or sentences. Because their substantive challenges lack merit, we affirm the convictions and sentences, but order that the abstracts of judgment for Grimaldi and Sandoval be corrected to reflect the actual credits awarded by the trial court.

**FACTS AND PROCEDURAL BACKGROUND**

**I. Facts**

In early May 2001, 13-year-old Jacqueline P. (Jacqueline) ran away from home.

Late in the afternoon of June 27, 2001, Jacqueline was in the company of Jorge Palacios (Palacios) and his girlfriend. Palacios belonged to the Francis clique of Mara Salvatrucha, a criminal street gang commonly known as "MS-13." Palacios sold drugs in the MacArthur Park neighborhood of Los Angeles, California; this was an important role within MS-13 because he

2

controlled a lot of money.  Palacios labeled Jacqueline a "chavala"—that is, a trespasser from another gang's "hood."  It was a gang's obligation to punish any chavala who set foot into its territory.

Acting on his own belief, Palacios and his girlfriend punched Jacqueline, knocked her to the ground, and continued to kick and punch her while she was on the ground.  Two other MS-13 gang members from the Park View clique—Sandoval and Grimaldi—came upon the beating, as did Alicia Montano (Alicia), who belonged to an all-female clique of MS-13.[1]  Palacios asked Alicia to join them in beating Jacqueline, but she declined.

Palacios told Sandoval and Grimaldi that they had to "take care of [Jacqueline]" because she was a chavala.  Moments later, another Park View clique member—Contreras—pulled up in a white car, and Palacios told him that "they had to get rid of [Jacqueline]."  Contreras agreed, and said he knew a place, but left because he wanted to switch cars.

Alicia took Jacqueline, who was bloodied and crying from the beating, to her sister Ana Montano's (Ana's) nearby apartment to freshen up.  Pedro Pena (Pena), Ana's boyfriend, arrived at the apartment and told Alicia to be careful of the Park View gang members who might also harm her.  Pena insisted on going along with the group so that he could protect Alicia.

Shortly thereafter, Contreras pulled up in a red car and parked in an alley.  Alicia, Jacqueline, Pena, and Grimaldi got into the back seat of the car, Sandoval was the front-seat passenger, and Contreras was the driver.  Contreras told the

---

1    Because Alicia Montano's sister is also a witness and shares the same last name, we will use the sisters' first names for clarity.  We mean no disrespect.

group they were driving to a "park" and got on the freeway. Contreras stopped the car under a freeway underpass and ordered Jacqueline into the car's trunk so roadway cameras would not be able to document her as a passenger.

They arrived at Elysian Park after nightfall. Grimaldi took Jacqueline with him up the hillside where there were some bushes, insisting that "he wanted to be the first one to be with her." Sandoval walked away leaving Alicia, Pena, and Contreras by the car. Later, Alicia walked up the hillside where she found Grimaldi and Sandoval with Jacqueline. Jacqueline was naked, sitting with her knees bent toward her chest, and her head facing down. Her soiled shorts were nearby, her loss of bowel control consistent with being in abject terror. Grimaldi pointed a gun at Jacqueline and told Alicia that she "had to take care of her," meaning to kill her. Grimaldi put the gun in Alicia's hands, got behind her with his arms wrapped around her and his hands over her hands holding the gun. Grimaldi and Alicia struggled, as Grimaldi tried to get Alicia to pull the trigger and she resisted, keeping her hands on the gun's grip. Jacqueline rose up and tried to grab the barrel of the gun but Sandoval pushed her back down to a sitting position. Grimaldi then pulled the trigger once, then a second time. Both bullets hit Jacqueline in the head. She died instantly.

Everyone piled back into Contreras's car, abandoning Jacqueline's naked body all alone in the dark.

During the car ride back to Park View, Grimaldi stated that Alicia was the one who shot Jacqueline. Alicia denied doing it, but Grimaldi reiterated that she did.

A few days after the murder, as Ana asked Alicia what happened to Jacqueline after she left the apartment, Grimaldi

"kind of laugh[ed]" and stated, "You should see that [Jacqueline] was crying for her life. And we rape her, and we just kill her."

Jacqueline's body was examined in an effort to locate DNA belonging to third parties. Nucleated epithelial cells present in saliva were found on a swab of her left nipple. The DNA found in that swab was one "septillion[2] times more likely" to have come from Grimaldi than anyone else. A sexual assault kit which included a vaginal swab and vaginal aspirate was screened for both male sperm and male DNA. It was established to a statistical certainty that Sandoval's DNA was present in both the swab and the aspirate.

## II.  Procedural Background

### A.  *Charges*

In 2012, a grand jury returned an indictment charging Palacios, Grimaldi, Sandoval, and Contreras with (1) murder (Pen. Code, § 187, subd. (a)), and (2) kidnapping to commit the crimes of rape and of committing a lewd or lascivious act on a child (*id.* § 209, subd. (b)(1)).[3] As to the murder count, the grand jury further alleged, as a special circumstance, that the murder occurred while the defendants were engaged in the crimes of kidnapping, rape and commission of a lewd or lascivious act upon

---

[2]   A septillion is a cardinal number represented in the United States by 1 followed by 24 zeros, and in Great Britain by 1 followed by 42 zeros.

[3]   The grand jury also charged Sandoval with the substantive crime of committing a lewd act upon a child under the age of 14 (§ 288, subd. (a)), but that count was dismissed on motion by the People.

All further statutory references are to the Penal Code unless otherwise indicated.

5

a minor (§ 190.2, subd. (a)(17)). The grand jury additionally alleged that both the murder and kidnapping were committed "for the benefit of, at the direction of, and in association with a criminal street gang" (§ 186.22, subd. (b)(1)(C)), that Sandoval and Grimaldi had personally discharged a firearm causing death (§ 12022.53, subd. (d)), and that a "principal" in these gang-related crimes had personally discharged a firearm causing death (*id.*, subds. (b) & (e)(1)).

### B. *Initial trial*

The matter proceeded to a five-month jury trial before two juries, with Palacios having a separate jury from the other defendants Contreras, Grimaldi, and Sandoval. In March 2018, a jury found Palacios guilty as charged, and found true both the special circumstance as well as all of the alleged enhancements. We affirmed the judgment in a separate appeal. (*People v. Palacios* (2021) 67 Cal.App.5th 184 (*Palacios*).) The jury was unable to reach a verdict as to Grimaldi, Sandoval, and Contreras; the trial court declared a mistrial.

### C. *Retrial and verdict*

Retrial commenced in January 2020 on the sole charge of murder.[4] The trial court encountered a 16-month midtrial delay due to the Covid-19 pandemic. Contreras and Grimaldi each testified on their own behalf; Sandoval did not testify.

The jury reached its verdicts on March 3, 2022. The jury convicted Sandoval of first degree murder, found true the special circumstance that the murder was committed during the

---

4 The first jury acquitted Contreras of the kidnapping count. The trial court dismissed the kidnapping count against the other defendants on the People's motion.

6

commission of both a rape and a lewd act, and found true the gang enhancement and the firearm enhancements relating to use by a principal. The jury convicted Grimaldi of first degree murder, found true the special circumstance that the murder was committed during the commission of both a rape and a lewd act, and found true the gang and all firearm enhancements. The jury convicted Contreras of second degree murder and found true the gang enhancement and the firearm enhancements relating to use by a principal.

### D. *Sentencing*

The trial court sentenced Grimaldi and Sandoval to identical sentences of life without the possibility of parole (LWOP) for the special circumstance first degree murder, plus a consecutive 25 years to life for the firearm enhancements.

The trial court sentenced Contreras to state prison for 40 years to life, comprised of 15 years to life for the second degree murder, plus a consecutive 25 years for the firearm enhancements.

### E. *Appeal*

Grimaldi, Sandoval and Contreras all filed timely notices of appeal, which we subsequently consolidated.

## DISCUSSION

### I. Pre-Charging delay

Grimaldi argues that the trial court erred in waiting until 2012 to indict him for Jacqueline's murder.

### A. *Pertinent facts*

Alicia first informed law enforcement that Grimaldi had shot Jacqueline in May 2006. At that time, official records showed that Grimaldi had been deported to El Salvador three months earlier, in February 2006. Grimaldi had illegally re-

7

entered the United States in March 2006, but the police investigating Jacqueline's death had no way of knowing that he had. Grimaldi was eventually arrested for his illegal reentry, and was interviewed about Jacqueline's murder in July 2010, while in a federal detention center. The People indicted Grimaldi for his role in Jacqueline's death in May 2012.

Prior to the retrial, Grimaldi moved to dismiss the indictment based on pre-charging delay. He argued that (1) the People were negligent in taking six years to charge him, and (2) during that window of time, a material witness crucial to his defense had died. The trial court denied the motion, finding that (1) Grimaldi had not established "actual prejudice" due to the delay because the lost witness had "nothing to do with [Jacqueline's murder]" and at "best" "corroborate[d] some relatively unimportant details," and (2) the People's justification for the delay outweighed any prejudice.

## B.    *Analysis*

Under both federal and California law, "'[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 874, quoting *People v. Catlin* (2001) 26 Cal.4th 81, 107.) To establish a constitutional violation, a defendant must as a threshold matter establish that the delay in charging prejudiced him. (*Alexander*, at p. 874.) Prejudice refers to the ""loss of material witnesses due to lapse of time . . . or loss of evidence because of fading memory attributable to the delay.""" (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).) Prejudice will not be presumed and must be established with evidence. (*Alexander*, at

8

p. 874.)  Only if the defendant demonstrates prejudice must the prosecution then offer its reasons for the delay and the court must then "'balance[] the harm to the defendant against the justification for the delay.'"  (*Ibid.*)  *Purposeful* delay almost always warrants dismissal, even where there is minimal prejudice.  (*Cowan*, at p. 431.)  Investigative delay—whether negligent or not—typically requires a much greater showing of prejudice.  (*Ibid.*; *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 915 ["the more reasonable the delay, the more prejudice the defense would have to show to require dismissal"].)  This stems from the recognition that "'[p]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt,'" and that courts may "not second-guess the prosecution's decision" in that regard.  (*People v. Nelson* (2008) 43 Cal.4th 1242, 1256 (*Nelson*).)

We review for substantial evidence a trial court's assessment of whether prejudice has been shown, and review for an abuse of discretion a trial court's balancing of prejudice against the justification for delay.  (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

1. *Prejudice*

Grimaldi's claim of prejudice stems from the unavailability of a witness named Jose Angel Ventura, who used the moniker "Slayer," and who allegedly died in 2008—which was *after* Alicia implicated Grimaldi in 2006 but *before* Grimaldi was indicted in 2012.  Specifically, Grimaldi argues that the absence of Ventura's testimony was prejudicial because Ventura would have testified that (1) the day before Jacqueline's death, Grimaldi and Jacqueline were left alone after a rooftop social gathering, which

9

created an opportunity for Grimaldi to kiss Jacqueline's breasts and thus provided an innocent explanation for how Grimaldi's DNA got on Jacqueline's nipple; (2) other gang members were displeased with Alicia for killing Jacqueline; and (3) Alicia confronted Grimaldi three days after Jacqueline's killing, and demanded that Grimaldi not tell anyone about it.

Substantial evidence supports the trial court's finding that Grimaldi's showing did not establish "actual prejudice."

Ventura's potential testimony that Grimaldi and Jacqueline had spent some time alone was not prejudicial for two reasons. First, the substance of this testimony is relatively unimportant. Ventura was not a percipient witness to Jacqueline's killing or to Grimaldi's whereabouts at the time of the killing. He was not even a percipient witness to Grimaldi placing his DNA on Jacqueline's breast the day before the killing. At most, his testimony was that Grimaldi and Jacqueline were left alone, where Grimaldi *could have* kissed Jacqueline's breast. While corroborative of Grimaldi's innocent explanation for the presence of his DNA on Jacqueline's body, it does not relate to an "essential fact." (See *People v. Coleman* (1968) 258 Cal.App.2d 560, 564 ["The required corroboration must relate to essential fact"].) Second, *Ventura's* testimony on this issue is not critical. Grimaldi indicated that he, Alicia, Sandoval and another individual named "Little Spider" were also all present when Grimaldi and Jacqueline were left alone. Because Little Spider could have testified to the same facts as Ventura, Ventura's absence was not prejudicial.

Further, Grimaldi did not establish prejudice arising from the absence of Ventura's potential testimony either that gang members were displeased with Alicia for killing Jacqueline or

10

that Alicia confronted Grimaldi after the murder. That is because Grimaldi did not establish that Ventura *witnessed* any of these statements firsthand, rather than hearing about it through others. Absent further detail, Ventura's testimony on these points was likely inadmissible hearsay; because it would have been excluded even if Ventura had been alive to proffer it, its absence was not prejudicial.

   2.    *Balancing of reason for delay against prejudice*

Grimaldi offers no evidence that the six-year pre-charging delay in this case was purposeful. Instead, the evidence indicates that investigators first learned of Grimaldi's involvement in May 2006, that investigators had reason to proceed with caution given that Alicia was a cooperating witness whose recounting of Jacqueline's murder varied as to many of the peripheral details, and that investigators continued to investigate and gather evidence (including the DNA evidence linking Grimaldi to the crime that was established *after* the indictment was returned)—reasonably believing until 2010 that there was no rush to charge Grimaldi because he had been deported. The trial court did not abuse its discretion in concluding that Grimaldi's relatively weak showing of prejudice did not outweigh the investigator's reasons for delay, and thus did not warrant dismissal of the very serious murder charges against Grimaldi. (See *People v. Shockley* (1978) 79 Cal.App.3d 669, 681 ["'In the weighing process, the seriousness of the crime for which the indictment is returned must be given appropriate consideration'"].)

Grimaldi responds with two sets of arguments.

First, Grimaldi argues that the investigators were negligent in their investigation because they could have run searches through the pertinent databases to discover he had

11

illegally re-entered the country and was in custody.  This argument ignores that the investigators had other reasons for continuing their investigation prior to presenting charges to the grand jury; it also rests on the notion—which we reject—that the investigators should have assumed that Grimaldi had violated the law by returning to the United States and that he would have wound up in custody (thereby obligating them to run periodic searches of the pertinent databases).

Second, Grimaldi argues that the facts of this case are analogous to the facts of *People v. Mirenda* (2009) 174 Cal.App.4th 1313 and *People v. Boysen* (2007) 165 Cal.App.4th 761, where the courts upheld findings of pre-charging delay. Those cases are inapt.  *Mirenda* upheld a finding of pre-charging delay where the investigators had no reason for postponing charging the defendant in 1982, by which time the case was "ripe for prosecution" (because the investigators had all of the evidence they used at trial) and knew the defendant's whereabouts in another state.  (*Mirenda*, at pp. 1318-1319, 1333.)  Here, by contrast, the investigators continued to investigate (and corroborate Alicia) through—and even beyond—the time of charging, and had no reason to believe Grimaldi was subject to prosecution in light of his deportation.  *Boysen* upheld a finding of pre-charging delay where the investigators waited 24 years to charge Boysen despite having incriminating information one year after the crime and where Boysen had presented "extensive evidence" of prejudice, including through the loss of testimony of two crucial but by-then deceased witnesses—one who heard a gunshot the night of the killing and another who was the first to arrive at the scene.  (*Boysen*, at pp. 765, 767, 778-781.)  Here, by contrast, Grimaldi's showing of prejudice was the loss of Ventura,

12

whose testimony was either collateral or inadmissible. What is more, the appellate courts in *Mirenda* and *Boysen* deferred to the trial court's finding of pre-charging delay under the abuse of discretion standard; here, Grimaldi is asking us to overturn the trial court's finding of no pre-charging delay.

## II.    **Grand Jury Proceedings**

Grimaldi argues that the trial court erred in not dismissing the indictment due to the People's failure to present exculpatory evidence to the grand jury. Sandoval joins in this argument.

### A.    *Pertinent facts*

#### 1.    *Grand jury proceedings*

The People presented the charges against Grimaldi and the others to the grand jury in May 2012. In doing so, the People called 12 witnesses, including Alicia and Herbert Rivera (Rivera).

Alicia's testimony before the grand jury largely tracked her testimony at the retrial—namely, that she had accompanied Grimaldi and Sandoval up the hill to where Jacqueline had been sexually assaulted; she and Grimaldi wrestled over the gun as Grimaldi tried to get Alicia to shoot Jacqueline and as Alicia tried to stop Grimaldi; and Grimaldi ultimately fired the weapon at Jacqueline.

Rivera testified that Sandoval told him that Alicia shot Jacqueline.

The grand jury returned the indictment.

#### 2.    *Litigation to dismiss the indictment*

Prior to the first trial, Grimaldi and the others moved to dismiss the indictment, but the trial court denied their motion after finding that "there [was] nothing that the grand jury wasn't told that would have any effect whatsoever on their finding of

13

probable cause."

Prior to the retrial, Grimaldi again moved to dismiss the indictment on the ground that the People failed to present three pieces of exculpatory evidence to the grand jury:

-- *Lares's confession.* In June 2002, Richard Gomez (Gomez), a career criminal seeking to become a jailhouse informant, told police that Daniel Lares (Lares) had confessed *to him* to killing an 18-year-old "runaway" girl and to dumping her body "by Dodger Stadium," although Gomez could not remember the girl's name. Gomez also told police that he had overheard Lares arguing with his mother during a jailhouse call, and that Lares later told Gomez that he was worried the police would talk to his mother about "a girl that he knew [who] had been murdered." Gomez told police Lares said he was worried because Lares had shot the girl once in the head after she denied taking money and drugs from Lares. Gomez's account of Lares's confession was inconsistent with Lares's statement to investigators four months earlier—in February 2002—where Lares said that he had seen Jacqueline, that she appeared to be homeless, that he never had sex with her, and that he heard about her murder a few months later.

-- *Rivera's additional statement about Alicia's role and motive as the killer.* As to Alicia's role, Rivera in a 2011 interview told police that *Contreras* had reported that Alicia was the person who shot Jacqueline and "left her right there on the floor or seating." As to Alicia's motive, Rivera in that same interview told police that he "th[ought]" "[Alicia] got jealous" because Sandoval "was screwing" Jacqueline.

-- *Alicia's reason for cooperating with law enforcement.* Alicia testified at the retrial that the federal officers who came to

her house "threatened to deport [her] or take away [her] kids." Before the grand jury, however, Alicia testified that she agreed to work with federal agents—and with the state law enforcement whom the federal agents had contacted to verify Alicia's information—after those agents conducted a probation search of her house because she felt "badly" about what happened to Jacqueline, because she believed Grimaldi and Sandoval were no longer a threat to her because they had been deported, and because she was receiving compensation for her cooperation.

Following a hearing, the trial court denied Grimaldi's motion. The court indicated that its reasoning had not changed since its denial of the prior motion on similar grounds—namely, that this additional information would not have affected the grand jury's decision to indict.

**B.    *Analysis***

In California, the People have the option of initiating criminal charges by presenting them to a grand jury, which is tasked with assessing whether the evidence presented establishes probable cause to believe a crime has been committed; if so, the grand jury issues an indictment setting forth those charges. (Pen. Code, § 889; *Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, 489-490 (*Berardi*); *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026.) For these purposes, "probable cause" exists when the evidence leaves the grand jury with a "strong suspicion" of the proposed defendant's guilt. (*Berardi*, at p. 490.) Because a grand jury proceeding is *ex parte* (that is, without the presence of a judge or defense counsel), and to ensure that the grand jury's finding of probable cause is an informed one, the People are statutorily required to present to the grand jury any exculpatory evidence of which the People are

15

aware.  (Pen. Code, § 939.71; see also *Johnson v. Superior Court* (1975) 15 Cal.3d 248, 255.)

Before an indictment will be dismissed, it is not enough to show that the People did not present exculpatory evidence. Dismissal requires a showing that the failure to present also "result[ed] in substantial prejudice."  (§ 939.71.)  "Substantial prejudice" means a showing of a reasonable probability that a grand jury presented with this additional information would have declined to find probable cause to indict—that is, a reasonable probability that, if the omitted information had been in the mix, the grand jury would not have a strong suspicion of the proposed defendant's guilt.  (*Berardi*, *supra*, 149 Cal.App.4th at pp. 494-495.)[5]  In making this determination, the court must evaluate the record as a whole, including the strength and nature of the exculpatory evidence that was not presented as well as the strength and nature of the evidence that *was* presented.  (*People v. Becerra* (2008) 165 Cal.App.4th 1064, 1070.)  We independently review the existence or nonexistence of substantial prejudice. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1146 (*Johnsen*).)

The People's failure to present to the grand jury the three categories of exculpatory evidence identified by Grimaldi did not result in substantial prejudice.

The omission of evidence of Lares's confession did not result in substantial prejudice because that confession was inadmissible and because it is not reasonably probable that the confession would have affected the grand jury's strong suspicion of Grimaldi's guilt.  The sole evidence of Lares's confession was

---

[5]     A defendant need not show that probable cause did not exist without the omitted exculpatory evidence.  (*Berardi,* at p. 497.)

16

through Gomez, so it would have been hearsay. Even if we assume for the sake of argument that the statement fell within the hearsay exception for declarations against interest, Lares's confession did not appreciably call into question the suspicion of Grimaldi's guilt necessary to indict. To begin, it is not clear whether Lares was confessing to *Jacqueline's* murder at all: Gomez did not know the name of Lares's victim; Lares reported his victim was "18 years old," but Jacqueline was 13; Lares said he fired one shot to the head, but Jacqueline had two gunshot wounds to the head; and Lares told Gomez that he dumped the body "by Dodger Stadium" and in one instance pointed to the stadium, but Jacqueline's body was left in Elysian Park, a larger park adjacent to Dodger Stadium. More to the point, the persuasiveness of Lares's confession to Jacqueline's killing falls apart completely because Alicia was able—during her grand jury testimony—to identify precisely where Jacqueline's body had been found, which would have been impossible had Lares been the sole killer.

The omission of evidence from Rivera's June 2011 interview also did not result in substantial prejudice. The failure to present evidence that Rivera said that *Contreras* had reported Alicia was the shooter did not affect the grand jury's probable cause determination because (1) Rivera had otherwise testified that *Sandoval* had reported that Alicia was the shooter, so Rivera's report that another person made the same report would have added little; and (2) Contreras's report of the shooter's identity came solely from Grimaldi, given that Contreras stayed near the car in Elysian Park and given that Grimaldi told everyone during the car ride back that Alicia had been the shooter. The failure to present evidence that Rivera believed

17

Alicia killed Jacqueline in a pique of jealousy also did not result in substantial prejudice because Rivera—in his very own words—admitted during the 2011 interview that his beliefs were based purely on his speculation rather than anything he saw or observed. Further, Alicia testified to the grand jury that she and Sandoval had an open relationship, which substantially undercut Rivera's speculative hypothecating to the contrary.

The omission of an additional reason that Alicia was cooperating with law enforcement—namely, that she feared deportation and losing her children—also did not result in substantial prejudice. As noted above, the grand jury was presented with several reasons as to why Alicia's motive to cooperate might prompt her to embellish or lie; contrary to what Grimaldi asserts, this additional possible reason to fabricate would not have reasonably probably affected the grand jury's evaluation of her credibility.[6]

## III. Instructional Issues

Contreras and Sandoval each challenge the trial court's rulings on the jury instructions. We review these challenges de

---

[6] Because we conclude that the failure to present this evidence did not affect the grand jury's deliberations, we have no occasion to consider the People's argument that we examine whether it affected the trial proceedings.

We also have no occasion to consider Grimaldi's argument—raised for the first time in his reply brief—that the prosecution somehow also violated *Napue v. Illinois* (1959) 360 U.S. 264 (*Napue*) by not eliciting an additional benefit (namely, a promise not to deport Alicia). There is also no evidence of any promise not to deport Alicia, so the prosecution's failure to elicit a promise that does not exist does not amount to presentation of false evidence.

18

novo.  (*People v. Parker* (2022) 13 Cal.5th 1, 68.)

**A.** ***Jury presented with invalid theory of murder liability***

Contreras argues that the jury was presented with an invalid theory of liability for murder, and that his conviction must accordingly be vacated.[7]  Specifically, he makes a three-step argument:  (1) California law no longer permits a murder conviction to rest solely upon a defendant's participation in a conspiracy to commit a lesser crime absent proof that defendant was the actual killer or *personally* harbored express or implied malice;[8] (2) the jury instructions in this case—specifically, the portion of the pattern jury instruction defining conspiracy stating that "[a] member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy" (CALCRIM No. 416)—left open the possibility that a jury could find him liable for Jacqueline's murder committed by Sandoval or Grimaldi—and

---

[7]    Grimaldi seeks to join this argument, but acknowledges that it only aids him if there is insufficient evidence that he was Jacqueline's actual killer.  Because, as noted below, we conclude there was sufficient evidence to support the personal use firearm enhancement against Grimaldi, Grimaldi's instructional challenge fails.

[8]    Contreras also briefly expresses his view that uncharged conspiracies violate due process, but this argument has been squarely rejected (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1200-1201, overruled on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192 (*Rangel*); *People v. Pike* (1962) 58 Cal.2d 70, 88) and, as explained below, we conclude that conspiracy—charged or uncharged—was not presented to the jury as an independent theory of criminal liability.

without finding that *Contreras* personally harbored an intent to kill—if (a) Sandoval or Grimaldi's acts were a natural and probable consequence of a conspiracy to rape or commit lewd acts upon Jacqueline, or (b) Sandoval or Grimaldi's acts of homicide "helped accomplish" the conspiracy of rape or committing lewd acts; and (3) this possibility necessitates reversal.

The first step of Contreras's argument is correct. Since 2018, a murder conviction in California must rest upon "a showing of the defendant's *personal* intent" rather than "the imputation of *someone else's* intent . . . based solely on the defendant's 'participation in a crime.'" (*People v. Duran* (2022) 84 Cal.App.5th 920, 927 (*Duran*), citing §§ 188, 189.) Thus, a defendant may be convicted of murder only if he (1) is the actual killer, (2) directly aided and abetted the actual killer while acting with the intent to kill, or (3) was a major participant in a felony while acting with reckless indifference to the value of human life. (*Ibid.*)[9] As a result, Contreras is correct that a defendant may not be found guilty of murder merely by virtue of the fact he aided and abetted someone else or conspired with someone else to commit some lesser crime,[10] that other person killed the victim, and that killing was a natural and probable consequence of the lesser crime the defendant aided and abetted or conspired to commit. (Accord, *People v. Farfan* (2021) 71 Cal.App.5th 942,

[9]    Contreras argues that a murder conviction is invalid unless it rests on the intent to kill, but that is simply not the law.

[10]    A defendant may still be convicted of murder under a theory of conspiracy *to commit murder* because that conspiracy requires proof of the defendant's intent to kill. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1226; *People v. Swain* (1996) 12 Cal.4th 593, 596 (*Swain*).)

956-957 [suggesting as much]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 975 [defendant aided and abetted a carjacking].)

The second step of Contreras's argument is only partly correct. Contreras is incorrect that the instructional language that a member of a conspiracy is "criminally responsible for the acts" of co-conspirators "done to help accomplish the goal of the conspiracy" authorized jurors to hold a conspirator responsible for the acts of co-conspirators that are a "natural and probable consequence" of the conspirators' plan or design. Contrary to what Contreras suggests, it is not appropriate to equate acts "done to help accomplish the goal of the conspiracy" (in other words, acts that are in furtherance of the conspiracy) with acts that are the natural and probable consequence of a conspiracy's plan or design. They are distinct concepts, which is why CALCRIM No. 417 is a separate jury instruction regarding liability for the natural and probable consequences of a co-conspirators' acts—and CALCRIM No. 417 was not given in this case. And, more to the point, it is not appropriate to treat CALCRIM No. 416's reference to acts "done to help accomplish the goal of the conspiracy" as equivalent to acts that are a "natural and probable consequence" of a conspiracy because the universe of acts that qualify as a natural and probable consequence is *bigger* than the universe of acts that are in furtherance of the conspiracy (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 741 ["a natural and probable consequence of a conspiracy need not be an act in furtherance of the conspiracy; it simply must be a "'reasonably foreseeable consequence of the [intended crime] aided and abetted'"]).

But Contreras is correct that it is possible to read the language from CALCRIM No. 416 as authorizing the jury to hold

21

Contreras "criminally responsible" for the "acts" of Sandoval or Grimaldi in killing Jacqueline if he conspired with Sandoval or Grimaldi to rape or commit lewd acts upon Jacqueline *as long as* killing Jacqueline was "done to help accomplish the goal of the conspiracy." Although upon first blush a killing committed *after* the rape or lewd act was completed would not seem to "help accomplish the goal" of a conspiracy to commit that rape or lewd act, the rape itself may be "deemed to continue so long as the culprit 'maintains control over the victim'" (*People v. Castro* (1994) 27 Cal.App.4th 578, 586), such that the conspiracy's "goal" was not completed until the rape was completed—and such that a killing while Jacqueline was still under the rapist's control "help[ed] accomplish the goal" of that conspiracy.

This possibility, however, is not enough to establish instructional error, which is why the third step of Contreras's argument fails. Although courts focus on whether it is *possible* for jury instructions to be read in a way that permits conviction on an invalid theory of homicide when deciding whether to grant post-conviction relief under section 1172.6 (see *Duran*, *supra*, 84 Cal.App.5th at p. 927; *People v. Lewis* (2021) 11 Cal.5th 952, 970-971 (*Lewis*)), that is not the applicable standard here. Here, we are evaluating whether there is instructional error on direct appeal of a conviction. Contrary to what Contreras asserts, the instruction at issue here is ambiguous: Although it is possible to read the instruction as permitting a jury to find a conspirator guilty of murder based on his participation in a conspiracy to commit a lesser crime, the instruction could also be read to serve a more modest purpose—namely, as defining what a conspiracy is and defining when a person becomes a member of a conspiracy for purposes of (1) assessing whether the felony-murder rule

22

applies under CALCRIM No. 540B, and (2) assessing which of Contreras's co-conspirator's statements were admissible under CALCRIM No. 418; both CALCRIM Nos. 540B and 418 were given in this case. Indeed, the CALCRIM No. 540B instruction explicitly pointed the jury to "the separate instruction[]" on "conspiracy." This more modest role for CALCRIM No. 416 is reinforced by the more generalized roadmap-type instruction informing the jury that Contreras and the others "have been prosecuted for first degree murder under two theories: (1) willful, deliberate and premeditated murder, and (2) felony murder."

Where, as here, a jury instruction is ambiguous, the question we must ask is not whether it is *possible* that the jury could have relied on the instruction to authorize a verdict on a legally invalid theory, but rather whether it is *reasonably likely* that the jury would have relied on that legally invalid theory in reaching its verdict. (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526; *People v. Riazati* (2011) 195 Cal.App.4th 514, 529; *People v. Ervin* (2021) 72 Cal.App.5th 90, 109.) In assessing what was reasonably likely, we look at the instructions as a whole as well as the arguments of counsel (*Ervin*, at p. 109) to determine "the meaning that the instructions *communicated to the jury*." (*People v. Benson* (1990) 52 Cal.3d 754, 801.) Here, it is not reasonably likely that the jury in this case would have read the sentence from CALCRIM No. 416 that Contreras highlights as authorizing it to find him guilty of murder based solely on his participation in a conspiracy to rape or commit lewd acts upon Jacqueline. The prosecutor argued only for first-degree murder during closing argument on the basis of an aiding and abetting theory, and the instructions explicitly referred to only "two theories" for first degree murder—willful, premeditated murder and felony-murder.

23

Conspiracy was not explicitly presented as a third possible theory. The prosecutor argued the case the same way, by noting the "multiple ways to get to first degree murder"—namely, the "willful, deliberate and premeditated murder" theory as well as the "conspiracy and felony murder" (and, as noted above, CALCRIM No. 540B makes a defendant who is in a conspiracy liable for felony-murder if that defendant acts with the intent to kill or is a major participant acting with reckless disregard for human life). The prosecutor never argued for liability on a stand-alone conspiracy theory. Thus, although we agree with Contreras that it is *possible* that the jury could have construed the one sentence in CALCRIM No. 416 as authorizing the jury to convict him of murder based on his participation in a conspiracy to commit a lesser crime, it is not *reasonably likely* that it did. As such, there is no instructional error.

Contreras resists this conclusion with what boils down to three further arguments.

First, Contreras argues that it is reasonably likely that his murder conviction rests on the theory that Jacqueline's murder was a natural and probable consequence of the conspiracy to rape or commit lewd acts on her because that is the only theory upon which the jury could have convicted him of *second* degree murder. He is wrong. The jury was presented with the option of convicting him of second degree murder as a person who directly aided and abetted her murder, but did so *without* premeditation and deliberation.[11] (Accord, *Swain*, *supra*, 12 Cal.4th at p. 601

---

11      The jury was not presented with a theory of second degree *felony-murder* because all of the underlying felonies in this case— rape, committing a lewd act, and kidnapping (as to others besides

24

["second degree murder" includes "unpremeditated murder with express malice"].)

Second, Contreras argues that CALCRIM No. 416 *implicitly* permits a jury to convict him of murder as long as he joined a conspiracy to commit a lesser crime and the murder was a "natural and probable consequence" of that lesser conspiracy. Again, he is wrong. As explained above, acts that "help accomplish the goal" of a conspiracy and acts that are the "natural and probable consequence" of a conspiracy's plan or design are *not* the same thing; Contreras would have us equate them. What is more, CALCRIM No. 417 is the instruction that explains the natural and probable consequences theory as it pertains to the acts of co-conspirators; Contreras would have us treat that pattern jury instruction as wholly superfluous of CALCRIM No. 416. This we decline to do.

Lastly, Contreras cites authority he claims supports his position that CALCRIM No. 416 authorizes a murder conviction based on a defendant's participation in a conspiracy to commit a lesser crime if murder is a natural and probable consequence of the conspiracy's plan or design. He cites *People v. Hardy* (1992) 2 Cal.4th 86, *People v. Rivera* (2015) 234 Cal.App.4th 1350, and *People v. Beck and Cruz* (2019) 8 Cal.5th 548, but those decisions each examine instructions that expressly refer to the natural and probable consequences doctrine. (*Hardy*, at p. 188; see generally CALJIC No. 6.11; *Rivera*, at p. 1356; *Beck and Cruz*, at p. 645.) He also cites *People v. Chiu* (2014) 59 Cal.4th 155, 158-159, superseded by statute in part as stated in *Lewis*, *supra*, 11 Cal.5th at p. 959, fn. 3, but *Chiu* prohibits liability for

Contreras)—would support a verdict only for first-degree felony murder. (§ 189, subd. (a).)

25

premeditated attempted murder when the defendant directly aids and abets a lesser crime, of which the killing is a natural and probable consequence; again, *Chiu* explicitly rested on the natural and probable consequences doctrine. None of these decisions casts any doubt on our construction of CALCRIM No. 416, which makes no reference to that doctrine.

**B.** *Failure to give a third-party culpability instruction*

Sandoval argues that the trial court erred in declining to give a jury instruction on third-party culpability.

1. *Pertinent facts and procedural background*

At trial, defendants presented evidence that Alicia was the actual killer of Jacqueline. More specifically, they presented evidence that (1) Alicia and Sandoval had a dating relationship, (2) Alicia was the "jealous" type and often suspected Sandoval of cheating on her, (3) Alicia's suspicions were well-founded because Sandoval was sleeping with Jacqueline, (4) Alicia had access to a .38 revolver, (5) Contreras reported that Alicia shot Jacqueline, and (6) Alicia told Grimaldi that she killed Jacqueline. Alicia's account of the incident also changed over time; among other ways, Alicia's testimony that Sandoval accompanied her and Grimaldi walking Jacqueline into the park differed from her earlier account that Sandoval had stayed in the car, and Alicia's testimony that Grimaldi put the gun in her hand and they struggled over it differed from her earlier account that did not mention her touching the gun.

Although the trial court admitted all of this evidence, the court declined to give a jury instruction regarding Alicia's possible culpability for Jacqueline's murder, finding that such an instruction would be "duplicative" of the pattern jury instruction

26

defining proof beyond a reasonable doubt; the court told the parties that Alicia's guilt is "something you can argue."

> 2. *Analysis*

Because neither party challenges the trial court's admission of the third-party culpability evidence pointing to Alicia as a possible actual killer of Jacqueline, the sole issue before us is whether the trial court erred in declining to instruct the jury with the third-party culpability instruction Sandoval proffered. The proffered instruction read:

> "You have heard evidence that Alicia Montano of her own volition and motivation committed the offense of murder with which the defendants are charged. *The defendants are not required to prove the guilt of Alicia Montano beyond a reasonable doubt.* The prosecution has the burden of proving the defendants are guilty of murder beyond a reasonable doubt."

(Italics added.)

> a. There was no instructional error

Because it constitutes a pinpoint instruction, a jury instruction on third party culpability need only be given if it is (1) requested by a party, (2) legally correct, and (3) not duplicative, confusing or argumentative. (*People v. Hartsch* (2010) 49 Cal.4th 472, 500, 504 (*Hartsch*); *People v. Harris* (2013) 57 Cal.4th 804, 853 (*Harris*).)

The trial court's refusal to give the third-party culpability instruction Sandoval requested does not constitute error because the proffered instruction is both duplicative and confusing. It is duplicative because the pattern reasonable doubt instruction given in this case already informs the jury that it cannot convict the defendant if the evidence, as a whole, raises a reasonable

doubt as to guilt; this is why third-party culpability instructions are almost always duplicative. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824-825; *Harris*, *supra*, 57 Cal.4th at p. 854; *Hartsch*, *supra*, 49 Cal.4th at p. 504; *Johnsen, supra,* 10 Cal.5th at p. 1158 ["There is no precedent that compels the trial court to instruct the jury specifically on the reasonable doubt standard in the context of third party culpability when the jury has already received a general instruction on the reasonable doubt standard"].) It is also confusing, because the italicized portion explaining that "[t]he defendants are not required to prove [Alicia's] guilt . . . beyond a reasonable doubt" suggests that Alicia's guilt of the crime of murder has some bearing on the defendants' guilt of the same. It does not. Two people can be guilty of murder when they directly aid and abet one another (Pen. Code, §§ 31, 971) or when they participate together in a felony that results in a death while harboring the requisite personal mens rea (*id.*, §§ 188, 189; *People v. Vang* (2022) 82 Cal.App.5th 64, 84 [so noting]). By directing the jury to focus on *Alicia's guilt*, the proffered instruction "would have been a distraction from the jury's duty to decide whether the prosecution had proven [*the*] *defendant*[*s'*] *guilt* beyond a reasonable doubt." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 55 [so concluding in a "situation," as here, in which more than "one of . . . two [people] could be guilty" of the charged crime]; cf. *People v. Madison* (1935) 3 Cal.2d 668, 677 [that defendant "was entitled to [a] special instruction" that the "circumstantial evidence must produce a reasonable and moral certainty that the accused, 'and that no other person', committed the offense charged" because it focuses on the accused's guilt].)

Sandoval resists this conclusion with what boils down to

two arguments.

First, he argues that a trial court must *always* give a third-party culpability instruction when requested; in support of this argument, he cites *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120, *People v. Wright* (1988) 45 Cal.3d 1126, 1131, *People v. Adrian* (1982) 135 Cal.App.3d 335, 341-342, and Evidence Code section 502. We reject this argument. To begin, the authority defendant cites does not aid him: None of the cases deals with third-party culpability instructions, and Evidence Code section 502 merely requires a court to instruct the jury on the burden of proof, which the court here already did with the pattern jury instruction on reasonable doubt. More to the point, the case law we cite above refutes any such blanket entitlement to a third-party culpability instruction.

Second, Sandoval argues that his proffered instruction is warranted in this case (1) because the "jury's natural inclination" would otherwise be "to improperly view the issue in terms of whether or not *the defense* had proven that Alicia committed the murder, as opposed to the prosecution having disproved it beyond a reasonable doubt" (italics added), and (2) because the CALCRIM No. 373 jury instruction telling the jury not to "speculate" about whether other persons may "have been involved" and "have been or will be prosecuted" "could have caused the jury to turn a blind eye to some of the facts pointing to Alicia's guilt."[12]

---

[12] Sandoval also asserts that his proffered instruction is necessary because "the jury must decide the guilt of two different people—the accused and the third party—under two different evidentiary standards." We frankly do not understand this assertion, as the jury is not deciding *Alicia*'s guilt; it is deciding

29

These arguments also lack merit.

Our Supreme Court has already rejected Sandoval's prognostication that a jury confronted with evidence of a third party's guilt would be distracted away from its job of assessing the defendant's guilt by thinking that the defense had to somehow prove the third party's guilt: "It is hardly a difficult concept," the court has said time and again, "for the jury to grasp that acquittal [of a defendant] is required if there is reasonable doubt as to whether someone else committed the charged crimes." (*Hartsch*, *supra*, 49 Cal.4th at p. 504; *People v. Lucas* (2014) 60 Cal.4th 153, 288 [same], overruled on other grounds by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54 & fn. 19.) Although a court does not err if, in "an . . . abundance of caution," it chooses to remind the jury that the charged defendant does not have to prove the third party's guilt (*People v. DePriest* (2007) 42 Cal.4th 1, 51), such an instruction is still "'repetitious of instructions already given'" and thus duplicative (*Lucas*, at p. 288).

Nor did the court's giving of the standard CALCRIM No. 373 instruction engender confusion necessitating a third-party culpability instruction. The CALCRIM No. 373 instruction also told the jury that it was not to speculate about the potential guilt of others *because* the jury's "duty [was] to decide whether the defendant on trial here committed the crime[s] charged," thereby effectively reminding the jury that its job was to decide whether the evidence proved *the defendants'* guilt beyond a reasonable doubt. As a result, the CALCRIM No. 373 instruction in no way negated the general reasonable doubt instruction or otherwise rendered a third-party culpability instruction necessary.

---

*his*. Further, he does not explain what he means by "two different evidentiary standards."

30

(*Johnsen, supra,* 10 Cal.5th at pp. 1157-1158 [holding that giving a CALJIC instruction similar to CALCRIM No. 373 did not necessitate or otherwise warrant a third-party culpability instruction].)

Nor was an instruction needed to correct any misstatement by counsel in closing arguments. At no point did the prosecutor or any attorney for each of the three defendants state, imply or even suggest that Alicia's guilt (or innocence) had to be proven by anyone or that the People did not at all times bear the burden of proving *each defendant's guilt* beyond a reasonable doubt. Indeed, defense counsel reminded the jury "that the State has the burden of proving all aspects of its case beyond all reasonable doubt."

### b. There was no prejudice

As our Supreme Court has repeatedly held, a trial court's failure to give a third-party culpability instruction is almost never prejudicial "because the [pattern] reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Hartsch, supra,* 49 Cal.4th at p. 504; *People v. Ledesma* (2006) 39 Cal.4th 641, 720 (*Ledesma*); *People v. Fayed* (2020) 9 Cal.5th 147, 178; *People v. Covarrubias* (2016) 1 Cal.5th 838, 907-908.) Indeed, even the refusal to give instructional language similar to the italicized language here (that is, that "it is not required that the defendant prove [the third party's guilt] beyond a reasonable doubt") is not prejudicial. (*People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*) [so holding].)

Sandoval also resists this conclusion, asserting (1) that the failure to give a third-party culpability instruction implicates a

31

panoply of federal constitutional rights, such that we must presume prejudice unless the People establish the absence of the instruction was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, and (2) that this demanding standard cannot be met because the evidence of Alicia's guilt was substantial. We reject this argument. Its first step is incorrect, as our Supreme Court has held that the failure to give a third-party culpability instruction is evaluated under *People v. Watson* (1956) 46 Cal.2d 818—not under *Chapman*. (*Earp, supra*, 20 Cal.4th at p. 887.) Its second step is also incorrect, as it is not reasonably probable that giving a third-party culpability instruction would have caused the jury to come to a different conclusion because, as noted above, the jury was elsewhere instructed that it could not convict any defendant unless each defendant's guilt was established by the People beyond a reasonable doubt. The presence of other instructions serving the same purpose as the third-party culpability instruction renders any analysis in the quantum of evidence of Alicia's guilt irrelevant.

## IV.    Evidentiary rulings

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Flores* (2020) 9 Cal.5th 371, 409.)

### A.    *Admission of evidence of a post-crime interaction*

#### 1.    *Pertinent facts*

During their case in chief, the People introduced evidence of an incident involving both Grimaldi and Alicia that occurred 10 or 11 days after Jacqueline's death.

The People read into evidence the entirety of Grimaldi's testimony from the prior trial. In that testimony, Grimaldi

32

stated that he was attacked on the street by a group of young men whom Grimaldi perceived were rival gang members and that Grimaldi—fearing for his life—got into a fistfight with them. Grimaldi went on to testify that, in the midst of that fight, Alicia showed up on the street and told Grimaldi to stop fighting because she was hiding from the police. Grimaldi stopped fighting. Grimaldi denied ever having a gun during that incident.

The People later called Alicia. Alicia testified that, on the occasion Grimaldi referred to, Grimaldi had forced rival gang members into an alleyway, that she and Grimaldi left to retrieve guns, and that she expected Grimaldi to kill the young men. Alicia stated that she then lied to Grimaldi—telling him that an onlooker had called the police—to dissuade Grimaldi from killing the young men, whom she believed were not gang members. Members of the MS-13 gang subsequently beat up Alicia for helping the suspected rival gang members.

The People then called one of the young men involved in the incident, who was named Arthur Gil. Gil testified that Grimaldi and another man—both of whom believed Gil to be a member of a rival gang—grabbed him, dragged him into an alley, and beat him up with their fists before Grimaldi pulled out a gun and pointed it at Gil and his companion. At that point, Alicia intervened by telling Grimaldi it would be stupid to shoot the two men and by repeatedly imploring Grimaldi to let them go. Grimaldi eventually acceded to Alicia's entreaty.

Before Gil testified, the trial court orally instructed the jury that Gil's testimony was "admitted for a couple of purposes"— namely, (1) "as to possible inconsistencies in other witnesses' testimony," and (2) "to review the character of Alicia . . . insofar

33

as it's been suggested she has a violent personality."  In its final written instructions, the trial court narrowed the jury's use of this incident, telling the jury that the incident could "only [be] consider[ed] . . . [to] evaluate the credibility or believability of a witness" and "not" "for any other purpose."

During its closing argument, the People only referred to this incident twice, and each time only in relation to Alicia's credibility.  The People mentioned it before summarizing Alicia's testimony regarding the charged crimes and as a preface to discussing her background and credibility.  The People also mentioned that Gil's account of the evidence rebutted the defense's assertion that Alicia "can't be trusted."

2.    *Analysis*

Grimaldi argues that the trial court erred in admitting evidence of this incident because (1) evidence of the incident constitutes improper propensity evidence—either of (a) Grimaldi's "bad" character for violence, or (b) Alicia's "good" character for non-violence, and (2) even if it does not, the danger that the jury might wrongly view it as improper propensity evidence substantially outweighs its probative value as evidence tending to corroborate Alicia's account of what happened when Jacqueline was killed.  Sandoval joins in this argument.

We reject this attack for two reasons.

First, the trial court did not abuse its discretion in admitting evidence of this other incident as evidence "support[ing] . . . the credibility of a witness"—namely, Alicia. (Evid. Code, § 1101, subd. (c); *People v. Stern* (2003) 111 Cal.App.4th 283, 295-296 [admitting evidence of an uncharged offense as relevant to credibility].)  At trial, Grimaldi testified that Alicia killed Jacqueline in a pique of jealousy and that

34

Grimaldi was not present at the killing; by contrast, Alicia testified that Grimaldi was present, that he brought a gun, that Alicia tried to stop him, but that Grimaldi ultimately put Alicia's hands on the gun to try to get her to shoot Jacqueline. All three witnesses who testified to the subsequent incident testified that Alicia showed up where Gil and his friend were being assaulted, that she urged Grimaldi not to continue, and that Grimaldi relented. These facts tend to parallel the sequence of events involving Jacqueline, and hence tend to corroborate Alicia's account of Jacqueline's murder over Grimaldi's. Although Alicia's credibility had not yet been attacked *with evidence* at the time the People read Grimaldi's testimony from the first trial (although her credibility had been attacked in argument), the "bad before good" rule for credibility evidence does not apply in criminal cases (*Stern*, at pp. 297-298; *People v. Harris* (1989) 47 Cal.3d 1047, 1081).[13]

Second, even if the trial court had erred in admitting evidence of this incident, its admission was not prejudicial. At no point did the trial court instruct the jury that the incident could be used as proof of *Grimaldi's* propensity for violence; indeed, the closing instructions stated that the incident could *only* be used to assess credibility and "for no other purpose." Thus, the jury could not have used this evidence as impermissible propensity evidence. (Accord, *People v. Johnson* (2022) 12 Cal.5th 544, 612

---

[13] Because the evidence is admissible to bolster Alicia's character for truthfulness, whether it is also admissible to attack Grimaldi's character for truthfulness is not dispositive; we accordingly need not consider Grimaldi's assertion that the People introduced portions of his prior trial testimony merely to attack his credibility regarding those portions.

(*Johnson*) [presuming the jury obeys instructions].) Although the trial court's midtrial oral instruction incorrectly informed the jury that it could consider the incident to "review" Alicia's "character" for violence or nonviolence, the court's final written instruction precluded that use. It is well settled that the written instruction controls. (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1112-1113.) But even if we give weight to the midtrial instruction, the admission of the incident to prove Alicia's propensity for nonviolence was harmless in light of the other substantial evidence of her propensity for nonviolence—in particular, Alicia's refusal to join Palacios and his girlfriend in beating Jacqueline and her conduct in helping Jacqueline get cleaned up after that beating. Further, the People only referenced the incident during closing argument to argue Alicia's credibility.

Grimaldi responds with what boils down to three arguments.[14]

First, Grimaldi argues that the incident could have been used to show his propensity for violence and Alicia's propensity for nonviolence. We need not examine whether the interpersonal dynamic between two individuals (here, Alicia's willingness to stand up to Grimaldi) constitutes "character" evidence in the abstract because, as noted above, the trial court in this case specifically instructed the jury *not* to consider the incident as

_____

14 In his reply brief, Grimaldi raises a fourth argument— namely, that specific instances showing character for truthfulness are inadmissible. He is wrong: Although Evidence Code section 787 generally prohibits specific instances of conduct to show character for truth and veracity, the California Constitution overrides that prohibition in criminal cases. (*People v. Harris, supra*, 47 Cal.3d at pp. 1080-1081.)

propensity evidence. We are to presume that the jury followed those instructions rather than violated them.

Second, Grimaldi argues that the danger that the incident might be misconstrued by the jury as propensity evidence substantially outweighed its probativeness as evidence of Alicia's character for truthfulness, such that the incident should have been excluded under Evidence Code section 352. Courts have "broad" discretion to weigh prejudice against probative value under this provision (*People v. Caparez* (2022) 80 Cal.App.5th 669, 683), and the trial court explicitly engaged in this balancing. The trial court did not abuse its discretion in concluding that the probative value of the incident to bolster Alicia's credibility was not substantially outweighed by the danger that the incident might be misused as propensity evidence, particularly when the court mitigated that danger with limiting instructions prohibiting the incident's use as propensity evidence. We reject Grimaldi's assertion that "[n]othing about the Gil incident" could bolster Alicia's credibility in light of her gang membership and prior arrest history; character evidence bolstering credibility does not become inadmissible merely because there is evidence undermining credibility.

Lastly, Grimaldi argues that admission of the incident violated due process. Because we find no error under the rules of evidence, we conclude there was no due process violation either.

**B.      *Exclusion of full transcripts of prior interviews of Alicia***

### 1.      *Pertinent facts*

Prior to testifying at the retrial, Alicia was interviewed by law enforcement twice in May 2006 (the first was unrecorded, the second recorded) and again in March 2011 (which was recorded).

37

At the first trial, the People played the recording of Alicia's 2006 interview in its entirety, and played portions of the recording of her March 2011 interview.

During the retrial, the People elected not to play the recordings. However, the defendants cross-examined and impeached Alicia using transcripts of those recordings—at first to refresh her memory as to her prior statements, and if that failed, then to impeach her by reading the pertinent snippet of the transcript into the record. This took time, and defendants repeatedly sought to play the entire recording of each interview. The trial court declined those requests, finding that "there is probably no legal basis" to play the tapes unless the People sought to do so.

2. *Analysis*

Grimaldi argues that the trial court was obligated to admit the full recording of Alicia's May 2006 and March 2011 interviews under Evidence Code sections 1235 and 356.[15] Sandoval joins in this argument.

Grimaldi and Sandoval are wrong.

The trial court did not abuse its discretion in excluding the entirety of Alicia's prior interviews. That is because, *as a whole*, those interviews constitute out-of-court statements by Alicia admitted for their truth—and hence are inadmissible hearsay. (Evid. Code, §§ 1200, subds. (a) & (b).)

---

**15** Grimaldi also invokes Evidence Code section 1520, but that deals with the secondary evidence rule and cannot overcome the hearsay issue that otherwise bars admission of Alicia's prior statements during the interviews.

38

Further, neither of the exceptions Grimaldi invokes authorizes the admission of the *full* interview recording or transcript.

Evidence Code section 1235 is the hearsay exception for "prior inconsistent statements"; as such, it authorizes the admission of a testifying witness's out-of-court statements if they are inconsistent with the witness's testimony and if the witness is subject to cross examination about those statements. (Evid. Code, §§ 1235, 770.) This is why Grimaldi and the other defendants could introduce those portions of Alicia's May 2006 and March 2011 interviews in which Alicia made statements inconsistent with her trial testimony. But section 1235 does not authorize admission of a witness's entire, earlier interview merely because some portions of that interview contain prior inconsistent statements.

Evidence Code section 356 is the so-called "rule of completeness" and can operate as an exception to the hearsay rule (see *People v. Arias* (1996) 13 Cal.4th 92, 156), but it does not support admission of Alicia's *entire* interviews. That is because the rule of completeness applies when a party introduces a portion of a witness's prior statement and the opposing party seeks to introduce other parts of that statement to ensure that the introduced portions do not "'create a misleading impression.'" (*People v. Williams* (2006) 40 Cal.4th 287, 319; *Johnson, supra*, 12 Cal.5th at p. 604.) Here, *the People* did not introduce portions of Alicia's prior interviews; *the defendants* introduced portions (as prior inconsistent statements) and now are arguing that they are entitled to introduce additional portions. The rule of completeness does not apply in this bootstrapping context. (*People v. Lawley* (2002) 27 Cal.4th 102, 155 ["defendant . . . was

39

the proponent, not the opponent, of the statements, hence [section 356] does not govern"]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1121-1122, overruled on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  Moreover, Grimaldi has not demonstrated that the entire interview transcripts were necessary to ensure that no misleading impression was created, yet that is a prerequisite to the application of the rule of completeness.  Not surprisingly, our Supreme Court has rejected similar requests to use the rule of completeness to introduce the *full* recording or transcript of a witness's prior interview.  (See *People v. Riccardi* (2012) 54 Cal.4th 758, 803, overruled on other grounds by *Rangel, supra*, 62 Cal.4th at p. 1216.)

Grimaldi resists this conclusion with four arguments.

First, he argues that introducing the full transcripts would be a less "painful" and more efficient way to impeach Alicia.  If accepted, this argument would ride roughshod over the hearsay rule and the rule of completeness by ignoring the explicit requirements for admitting evidence under each rule.

Second, Grimaldi asserts that his position is supported by a variety of cases.  He is wrong; none of these cases supports the introduction of a witness's prior full statement on facts similar to these.  (Cf. *People v. Ramirez* (2022) 13 Cal.5th 997, 1115 [admitting whole transcript, not for truth of witness's prior statements, but to show interrogators' conduct toward witness during the interview]; *People v. Clark* (2016) 63 Cal.4th 522, 599-600 (*Clark*) [same]; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 479-480 [admitting—under Evidence Code section 352 rather than the rule of completeness—whole recording to rebut accusation that recording device was turned on and off]; *People v. Johnson* (2015) 61 Cal.4th 734, 765-766 [admitting witness's

prior interview statements to show witness's motive to lie due to fear; not addressing rule of completeness at all]; *People v. Alcala* (1992) 4 Cal.4th 742, 763 [recounting admission of full transcript of witness's prior interview without discussing propriety of that admission]; *People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1396 [same].)  Grimaldi also seems to suggest that, much as a picture is worth a thousand words, a full transcript gives a better "big picture" of what was said in a prior interview; Grimaldi is essentially inviting us to re-write the rules of evidence for policy reasons, and we must decline this invitation.

Third, Grimaldi argues that the Truth-In-Evidence provision of the California Constitution entitles him to introduce the full transcript of Alicia's May 2006 and March 2011 interviews.  This argument ignores that the Truth-in-Evidence provision explicitly declares that it "shall [not] affect any existing statutory rule of evidence relating to . . . hearsay."  (Cal. Const., art. I, § 28, subd. (f)(2).)  Thus, this provision cannot provide a basis for ignoring the hearsay rule that otherwise mandates exclusion of any portion of Alicia's prior statements that is not inconsistent with her trial testimony.

Fourth, Grimaldi argues that exclusion of the full transcripts violates due process.  He cites no precedent to support his position that due process is violated merely because he is not entitled to introduce whatever hearsay he prefers.

## V.    **Prosecutorial Misconduct**

Grimaldi argues that the People committed prosecutorial misconduct by presenting "false" testimony by Alicia because they did not immediately impeach her, while she was on the stand, with every prior statement she made that was inconsistent with her testimony.  Sandoval joins in this argument.  We review

41

claims of prosecutorial misconduct for an abuse of discretion (*People v. Peoples* (2016) 62 Cal.4th 718, 792-793), but review the meaning of due process de novo (*In re Jonathan V.* (2018) 19 Cal.App.5th 236, 241).

### A. *Pertinent facts*

Prior to testifying at the trial in this matter, Alicia recounted the crime at issue in this case on five occasions: (1) she was interviewed by police in early May 2006; (2) she was re-interviewed eight days later in mid-May 2006; (3) she was interviewed one more time in March 2011; (4) she testified before the grand jury in May 2012; and (5) she testified at the first trial in November 2017.

During the retrial, Alicia testified for 11 days. Cross examination by Grimaldi and the other defendants occupied 9 of those 11 days. Grimaldi now points to five portions of Alicia's testimony that are inconsistent with her pre-trial statements to some extent:

(1) Alicia testified that she took Jacqueline up to her sister Ana's apartment. This was inconsistent with Alicia's statement, during her March 2011 interview, where she denied that Jacqueline went to Ana's apartment.

(2) Alicia testified that she did not remember telling police officers about MS-13 gang members kidnapping and killing 18th Street gang members. This was inconsistent with Alicia's statement, in her May 2006 interview, where she told officers that MS-13 gang members had kidnapped and killed 18th Street gang members.

(3) Alicia testified that she and the others walked from the intersection of Magnolia and 8th Street to the intersection of Park View and 8th Street before getting into the car Contreras

42

was driving.  This was inconsistent with Alicia's statement, during her May 2006 interview, where Alicia reported that the group got into Contreras's car at the intersection of Magnolia and 8th Street.

(4)     Alicia testified that Pena (Ana's boyfriend) was present at Elysian Park, pulled out a gun, pointed it at defendant, and told Grimaldi to let Alicia go.  This was inconsistent with Alicia's May 2012 grand jury testimony, where she did not mention that Pena had a gun.

(5)     Alicia testified at trial that the first time she saw Jacqueline was on the day of the murder.  This was inconsistent with Alicia's May 2012 grand jury testimony, where she testified that she had seen Jacqueline with Palacios two days before the murder.

In a motion for new trial, Grimaldi argued (among other things) that the People had presented "false" testimony by Alicia because it did not elicit these inconsistencies in her testimony in front of the jury.  The trial court denied the motion on this ground.

### B.     *Analysis*

A prosecutor violates due process—and hence commits misconduct—if they present, or fail to correct, "false testimony." (*Napue*, *supra*, 360 U.S. at p. 269; *People v. Vines* (2011) 51 Cal.4th 830, 873 (*Vines*), overruled in part on another ground by *People v. Hardy* (2018) 5 Cal.5th 56, 104.)  Due process is violated if the false testimony pertains to a witness's substantive testimony about the crime at issue or about the witness's credibility.  (*Napue*, at pp. 269-270; *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1385-1386.)  If "false testimony" is presented, a new trial is required unless its instruction was harmless beyond

43

a reasonable doubt. (*In re Jackson* (1992) 3 Cal.4th 578, 597-598, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6.)

The prosecutor did not run afoul of *Napue*—and hence did not commit misconduct—by failing to elicit each of Alicia's inconsistencies before the jury during trial. That is because, and as our Supreme Court has explicitly held, "[m]ere inconsistencies between a witness's testimony [at trial] and her prior statements do not prove the falsity of the testimony." (*Vines*, *supra*, 51 Cal.4th at p. 874.) Because the inconsistencies between Alicia's testimony and her prior statements do not render Alicia's testimony "false," the prosecutor did not violate due process by failing to correct "false testimony."

This outcome makes sense. There is no claim that Grimaldi did not have access to each of Alicia's prior five recountings of the crimes at issue, and hence had the ability to cross-examine her on any inconsistencies. (See *People v. Avila* (2009) 46 Cal.4th 680, 711-712; *People v. Riel* (2000) 22 Cal.4th 1153, 1211-1212.) Indeed, such cross-examination is ""'the greatest legal engine ever invented for the discovery of truth.'""" (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1278.) More to the point, construing *Napue* as placing a duty upon the prosecution to impeach each of its witnesses with every inconsistency—on pains of violating due process and thus entitling a defendant to a new trial unless that inconsistency is harmless beyond a reasonable doubt—would encourage defense counsel to sit back and wait for the prosecution to miss a single prior inconsistency, and thereafter seek a retrial. We decline to adopt a rule that would so transmogrify criminal trial practice and encourage gamesmanship.

44

## VI.    Sufficiency of the Evidence

Grimaldi challenges the sufficiency of the evidence supporting his convictions and firearm enhancement with what boil down to two arguments.  First, he argues that the testimony of Alicia and Ana was so internally inconsistent as to be insufficient to support his conviction and enhancement.  Second, he argues that no evidence corroborated Alicia's testimony, which means her testimony must be entirely disregarded because she was an accomplice as a matter of law.

### A.    *Credibility-based challenge*

In evaluating Grimaldi's credibility-based challenge to the sufficiency of the evidence, our sole task is to assess whether the record contains ""substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."" (*People v. Clark* (2011) 52 Cal.4th 856, 942.)  In undertaking this inquiry, we ""review the whole record in the light most favorable to the judgment below"" (*ibid.*), which includes "resolv[ing] conflicting inferences" and credibility findings in favor of that judgment.  (*People v. Casares* (2016) 62 Cal.4th 808, 823, overruled on other grounds by *People v. Dalton* (2019) 7 Cal.5th 166, 214; *People v. Reed* (2018) 4 Cal.5th 989, 1006.)  Applying this standard, the testimony of a single witness can establish a fact.  (Evid. Code, § 411; *People v. Provencio* (1989) 210 Cal.App.3d 290, 306.)  What is more, it is not for us to second guess the jury's decision to credit all or part of that witness's testimony (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830 ["the trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest"]); the only time we can gainsay a jury's credibility finding is if that

witness's "testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions'" (*People v. Cudjo* (1993) 6 Cal.4th 585, 608 (*Cudjo*); accord, *People v. Friend* (2009) 47 Cal.4th 1, 44).

There is no question the testimony of Alicia and Ana was riddled with inconsistencies and not wholly motivated by altruism, as Grimaldi points out.

Alicia testified inconsistently about (1) the degree to which Sandoval was involved in the kidnapping and murder (initially saying he was solely the driver, but later testifying Sandoval went up on the hill with Grimaldi, Jacqueline and herself), (2) the degree to which Pena (Ana's boyfriend) was involved (initially omitting that he went to Elysian Park with them), (3) the degree to which Ana was involved (initially omitting her involvement), (4) the precise location of where she, Jacqueline and the others got into the car driven by Contreras (moving the location by one block), (5) whether she had struggled with Grimaldi over the gun (initially omitting that she had), and (6) whether she spoke with Rivera after the shooting.[16] Alicia also admitted to cooperating with law enforcement to avoid deportation and the loss of her children and inaccurately denied receiving a payment from law enforcement for her cooperation in this case.

Ana testified inconsistently about (1) who she saw in the group getting into Contreras's car from her residence, (2) whether

---

[16] Grimaldi points to other inconsistencies in Alicia's testimony that are unrelated to the sequence of events leading up to Jacqueline's death, such as (1) whether she spent time with Ana's boyfriend's brother on the day of that death, (2) whether MS-13 gang members had killed their rivals, and (3) whether she had *cut* the hand or *cut off* the hand of a man who had raped her when she was growing up in Central America.

her boyfriend was part of that group who went to Elysian Park, and (3) *when* she witnessed a conversation between Alicia and Grimaldi about Jacqueline's killing. Ana also admitted to cooperating to protect her family and receiving payments for her cooperation.

But nothing Alicia or Ana testified to was "physically impossible" or "fals[e]" on its face. (*Cudjo*, *supra*, 6 Cal.4th at p. 608.) Indeed, Alicia's testimony regarding the core events of the night at issue—Palacios's role orchestrating the abduction as well as Grimaldi's central role in shooting Jacqueline—remained consistent throughout all of Alicia's recounting of the night at issue.

Grimaldi makes two further arguments in this regard. First, he argues that *People v. Reyes* (1974) 12 Cal.3d 486 obligates us to reverse. It does not. In *Reyes*, the court held that there was insufficient evidence to support a murder conviction against co-defendant Venegas when the sole evidence connecting Venegas to the scene was the testimony of one witness who said that Venegas "looked more like" the person she saw because Venegas had longer hair; two other persons near the scene of the crime could not identify Venegas at all. (*Id.* at pp. 492-499.) Here, Alicia positively identified Grimaldi as the shooter, and Grimaldi's DNA was found on Jacqueline's nipple. The quantum of evidence in this case is substantially greater than against Venegas in *Reyes*. Second, Grimaldi argues that the trial court's observations that Alicia was "a really problematic witness to say the least" and that she had "told some rather contradictory things" somehow trumps our conclusion that the evidence is otherwise sufficient to uphold Grimaldi's conviction for murder. It does not, legally. And it does not, factually: That is because

47

Grimaldi has ripped the trial court's statements out of context. The trial court noted that Alicia "has told some rather contradictory things *for the jury to consider*" in the course of denying defendants' mid-trial motions for acquittal, thereby indicating that it was for the jury to decide Alicia's credibility. (Italics added.) The jury obviously found her credible, and we cannot second guess that finding now.

### B. *Challenge based on Alicia being an accomplice as a matter of law*

In this variant of his substantial evidence challenge, Grimaldi argues that there is insufficient evidence to support his murder conviction and the firearm enhancement because (1) the only evidence that he killed Jacqueline and used a gun to do so came from Alicia, (2) Alicia was an accomplice as a matter of law, (3) the testimony of an accomplice must be corroborated, and (4) there is no other evidence to corroborate Alicia's account of the killing as a percipient witness.

Grimaldi has the law right. A defendant's conviction cannot rest upon "the testimony of an accomplice" unless that testimony is "corroborated" by "other evidence" that "tend[s] to connect the defendant with the commission of the [charged] offense[s]." (§ 1111.) An "accomplice" is "defined as one who is liable to prosecution for the identical offense[(s)] charged against the defendant" in that case. (*Ibid.*) A person is "chargeable with an identical offense" if they are a "principal," which means that the person has either (1) directly committed the crime, or (2) aided and abetted in its commission. (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369; § 31; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90 [principals include aiders and abettors]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [same].)

48

But, under this law, corroboration is required only if Alicia is an accomplice as a matter of law, which occurs only "'"'"when the facts regarding the witness's criminal culpability are "clear and undisputed"'"'"' and thus "'"'"'permit[] only [the] single inference"'"'"' that the witness is an accomplice (*Clark*, *supra*, 63 Cal.4th at p. 606, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 312). If the evidence at trial is not "clear and undisputed"—and hence gives rise to "conflicting inferences" as to whether Alicia was an accomplice—then it was up to the jury to decide whether Alicia was an accomplice and we must defer to the jury's implicit determination that she was not an accomplice (and that no corroboration was required).

Here, the evidence that Alicia directly committed Jacqueline's killing is conflicting: Grimaldi told several people Alicia pulled the trigger, but Alicia steadfastly denied it.

Here, the evidence that Alicia directly aided and abetted Jacqueline's killing was also conflicting. To be an aider and abettor, a person must (1) do something to aid, promote, or encourage the charged crime(s), (2) while knowing of the perpetrator's unlawful intent, and (3) while intending to encourage the crime(s). To aid and abet a murder, a defendant must either (1) share the perpetrator's intent to kill; or (2) *know* that the perpetrator was going to commit a "life-endangering act," intend to aid the perpetrator with that act, and know that the act is "'dangerous to human life, and act[] in conscious disregard for human life.'" (*People v. Reyes* (2023) 14 Cal.5th 981, 991.)

The evidence of whether Alicia acted with intent to kill was conflicting. Alicia was certainly present when Grimaldi killed Jacqueline; she knew that Grimaldi, Sandoval and Contreras

49

intended to kill Jacqueline; and she did not do anything to stop the killing.  As explained above, however, these facts are insufficient to make Alicia an aider and abettor *at all*—let alone an aider and abettor *as a matter of law*.  Alicia also had no duty to stop the killing; Alicia took no actions that could be viewed as unequivocally aiding or encouraging the killing, as taking Jacqueline to freshen up at Ana's apartment is just as reasonably viewed as an act of compassion as an attempt to calm Jacqueline down and thus facilitate the killing intended by the others, and Alicia did not drive to the park, did not bring a weapon, and denied acting as a lookout.  Alicia disclaimed any intent to kill Jacqueline, a disclaimer confirmed by the facts that she feared Grimaldi, that she asked Ana's boyfriend to come along to protect her from Grimaldi, and that Grimaldi had to drag Alicia by her hair and had to wrestle the gun into her hand. (See *People v. Williams* (2008) 43 Cal.4th 584, 637 [where witness "denie[s] he had the intent to further [the direct perpetrator's] criminal purpose," witness is not an accomplice as a matter of law]; *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1376 [same].)  To be sure, the jury could have rejected Alicia's testimony and found that Alicia acted as a lookout, while knowing of the others' plan to kill Jacqueline and sharing their intent to kill her.  But the evidence was in conflict, and thus precluded a finding that Alicia was an accomplice as a matter of law.

The evidence whether Alicia intended to aid in the commission of a life-endangering act of kidnapping Alicia and acted in conscious disregard of the knowledge that the act was dangerous to human life was also conflicting.  Alicia was present for the kidnapping, knew that the others planned to rape

50

Jacqueline and commit lewd acts upon her, and did not stop them. But Alicia also had no duty to stop the kidnapping, took no actions that could be viewed as unequivocally supporting or encouraging the kidnapping, and disclaimed any intent to kidnap or otherwise harm Jacqueline. Once again, the jury could have found Alicia to have been a principal, but the evidence on that issue was conflicting. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 94 [evidence sufficient to permit a finding does not compel that finding as a matter of law].)

Because the evidence that Alicia was an accomplice was conflicting, she was not an accomplice as a matter of law and no corroboration was required. (Also, because she was not an accomplice as a matter of law, the trial court was not obligated to instruct the jury that she was.)

Grimaldi makes three further arguments.

First, he argues that there is sufficient evidence at trial to find her liable as an aider and abettor under *People v. Banks* (2015) 61 Cal.4th 788, and *Clark*, *supra*, 63 Cal.4th 522, because there was evidence that Alicia was a "major participant in the underlying felonies [of] kidnapping, rape and/or lewd and lascivious conduct" who "acted with reckless indifference" to human life. This is true, but irrelevant because the evidence on this point was conflicting, such that Alicia was not an accomplice as a matter of law and her uncorroborated testimony is sufficient to support Grimaldi's conviction.

Second, Grimaldi argues that Alicia was not a credible witness, such that her testimony has *no* weight and thus cannot create conflicting evidence. We have already rejected that argument.

Third, Grimaldi argues that that the trial court improperly

51

relied on the doctrine of law of the case by citing this Court's opinion in *Palacios*, *supra*, 67 Cal.App.5th 184 when denying Sandoval's request to designate Alicia as an accomplice as a matter of law. This is irrelevant. Our task is to evaluate the trial court's ruling, not its rationale (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 ["'we review the ruling, not the court's reasoning'"]), and we have concluded that its ruling was sound.

## VII.   Ineffective Assistance of Counsel

Grimaldi argues that his trial counsel was constitutionally ineffective for not presenting evidence of Lares's confession. We independently review such claims. (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance [of counsel] is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Even if there is a showing of deficient performance, counsel is ineffective only if it is reasonably probable that the result would have been more favorable to the defendant but for his counsel's errors. (*Ledesma*, *supra*, 39 Cal.4th at p. 746.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

We independently determine that Grimaldi has not shown "no satisfactory explanation" for his trial counsel's decision not to introduce evidence of Lares's confession. To the contrary, there are many sound tactical reasons not to do so. For starters, and as

detailed above, Lares's confession was likely inadmissible and of dubious believability. Further, and more to the point, the theory presented by Lares's confession (namely, that *Lares* killed Jacqueline) was fundamentally inconsistent with the defense theory of the case (namely, that *Alicia* killed Jacqueline because Alicia abducted Jacqueline just before Jacqueline's death while Grimaldi looked on, and that Alicia later told Grimaldi that she had been the killer).

Grimaldi responds with two further arguments.

First, he asserts that we must find his trial counsel to be ineffective unless the People can "irrefutably disprove[] Gomez's testimony about Lares's confession." This is the wrong legal standard. On direct appeal, we can find counsel's performance to be ineffective only if we can infer no reasonable tactical reasons for counsel's decisions. Here, we have found several such reasons.

Second, Grimaldi disputes that introduction of Lares's confession would be inconsistent with his own testimony implicating Alicia because, in his view, "there is nothing intrinsically inconsistent between [his] testimony and Lares's confession." Grimaldi may have a point: It is not physically *impossible* for Alicia to have abducted Jacqueline on the day of her death, for Alicia to drop off Jacqueline on Olympic Boulevard where Lares could find her, for Lares to drive Jacqueline to an area near Dodger stadium to shoot her once, for Alicia to happen upon Jacqueline in the wilds of Elysian Park, and for Alicia to shoot Jacqueline a second time in the head and then tell Grimaldi days later that she was the sole killer. While not physically impossible, a lawyer would act reasonably in concluding that such a tale is so coincidental as to be fanciful and utterly

53

unbelievable, and on that basis to omit Lares's confession and to stick with the more straightforward and believable defense that Alicia was the sole evildoer.

## VIII. Cumulative Error

Grimaldi argues that the cumulative errors that occurred during trial necessitate reversal of his conviction. Because we reject the defendants' individual claims of error, we necessarily conclude there was no cumulative error. (Accord, *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative error where no individual error exists].)

## IX. Sentencing Error

The abstracts of judgment for both Grimaldi and Sandoval must be corrected because the trial court orally pronounced that Sandoval had 4,146 days of actual custody credit at the time of sentencing, but his abstract lists only 3,700 days and orally pronounced that Grimaldi had 3,700 days of actual custody credit at the time of sentencing, but his abstract lists 4,146 days. It appears the numbers were transposed and the trial court is ordered to correct this clerical error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

The judgments are modified: (1) to reflect 4,146 days of actual custody credit for Sandoval; and (2) to reflect 3,700 days of actual custody credit for Grimaldi.  The clerk of the superior court is directed to prepare amended abstracts of judgment and to forward copies to the Department of Corrections and Rehabilitation.  As modified, the judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

---

* Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.